UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                          CASE NO. 17-20701
                                            HON. DENISE PAGE HOOD

v.

DR. BERNARD SHELTON,

      Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION TO AMEND FIRST SUPERSEDING INDICTMENT [#41], GRANTING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PATIENT DEATHS [#40], and DENYING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF DRUG DIVERSION [#42]**

**I.    Introduction**

Defendant has been charged in a 21-count Indictment with unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1). Count Seven charges that Defendant's prescription of oxycodone for a patient (Dennis Hooey or DH) resulted in DH's death. Conviction on Count Seven carries a mandatory minimum sentence of 20 years to life.

On December 4, 2018, Defendant filed a Motion in Limine to Exclude Evidence of Patient Deaths [Dkt. No. 40] and a Motion in Limine to Exclude Evidence of Drug Diversion [Dkt. No. 42]. Both Motions in Limine have been fully briefed. On the same day, the Government filed an unopposed Motion to Amend First Superseding Indictment [Dkt. No. 41].

## II. Background

DH was a patient of Defendant for approximately the four-year period preceding his death. Defendant had prescribed DH Xanax, Valium, hydrocodone and oxycodone at various times. DH was a heroin user, drug addict, an alcoholic, and a chain smoker; he abused prescription drugs; and he had been hospitalized on numerous occasions for alcohol intoxication and withdrawal. Defendant would give DH urine tests to determine if DH was taking medications appropriately. DH would frequently test negative for drugs that Defendant had prescribed, which (according to the Government) "indicates that a patient may be taking more of a drug than prescribed, using all of the medication before the next visit to the doctor." Dkt. No. 3, PgID 90-91. DH admitted to Defendant (as set forth in DH's patient chart) taking too much medication. DH also would test positive for drugs not prescribed., which (according to the Government) "indicates that a patient is getting narcotics from other illegitimate sources." *Id.* at PgID 91.

DH last saw Defendant on January 14, 2016, when DH complained of a back injury that required DH to stay on a couch. By that time, DH had been taking oxycodone (prescription of 10mg, two tablets every eight hours) for an extended period of time for back pain. At the January 14, 2016 visit, Defendant prescribed DH oxycodone (15 mg, two tablets every eight hours) and Xanax. Those prescriptions were filled on January 18, 2016. On January 20, 2016, DH was hospitalized for shortness of breath/shallow breathing, which the Government states is "a sign of possible opioid overdose/abuse," *id.*, and received several doses of naloxone during that hospitalization.

On January 23, 2016, DH took medications, fell asleep on the couch, was heard snoring about 3:00 a.m. on January 24, 2016, and was found unresponsive by his fiancée/girlfriend later that day, when he was pronounced dead. At the time of DH's death, there were 49 less oxycodone pills and six less Xanax pills than should have been left from the medications filled on January 18, 2016 (if the medications were taken as directed).

An autopsy was conducted by the Deputy Macomb County Medical Examiner on January 25, 2016. The Deputy Macomb County Medical Examiner concluded that DH died as the result of "[i]ntoxication by the combined effects of multiple prescription medications." Dkt. No. 34, Ex. B at 20. The toxicology report indicated that the levels of prescription medications in his blood (for Valium, Xanax, and oxycodone) were at very low levels and that there was a presence of opiates (at an unreported level) and benzodiazepine (Xanax), which (according to Defendant) "suggests [DH] apparently had used a substance like heroin or fentanyl." Dkt. No. 28, PgID 68. The autopsy report stated that there was bruising on the inside of each elbow.

## III. Analysis

### A. Motion to Amend First Superseding Indictment

The Government moves the Court to amend the First Superseding Indictment to correct the date in Count 17. The Government desires to change the date from "1/30/2016" to "1/30/2015," as the former date was a typographical error. Defendant does not oppose the proposed change or amended First Superseding Indictment.

Accordingly, the Court grants the Government's Motion to Amend First Superseding Indictment.

B. **Evidence of Other Patient Deaths**

The Government intends to offer evidence at trial that two former patients of Defendant died of suspected drug overdoses <u>that are not attributable to Defendant</u>. Patient BE was a drug addict receiving narcotics from Defendant for many years. BE overdosed on April 30, 2016 and died on May 2, 2016 (about three months after DH died) after being taken off life support at the hospital. BE filled her last oxycodone prescription from Defendant two days prior to her overdose. The medical examiner's toxicology report showed fentanyl, hydrocodone and Xanax in BE's blood. According to the autopsy report, BE died when her heart stopped due to the combined effects of Xanax, fentanyl and hydrocodone.

Patient AL was also a drug addict for whom Defendant prescribed the "holy trinity" -- an extremely dangerous combination of hydrocodone (an opioid), carisoprodol (a muscle relaxant) and alprazolam (Xanax). According to the Government, this combination is particularly sought after by drug addicts because these drugs "potentiate" (heighten) the high that addicts seek. AL died of an overdose on July 1, 2014 -- less than one week after filling prescriptions issued by Defendant (and approximately 18 months before DH died). The medical examiner's post-mortem toxicology report showed opiates in AL's blood and urine, heroin in the urine, and Xanax in the blood and urine. According to the autopsy report, the cause of death for AL was from a combination of

heroin and multiple prescriptions drugs.

In conjunction with the introduction of the evidence of the deaths of AL and BE, the Government proposes that the Court give the following instruction:

> You have heard testimony that former patients BE[] and AL are dead. The defendant did not prescribe the drugs causing the deaths of these patients. The defendant is not charged with causing the death of these patients. This evidence is admitted to show the defendant's knowledge that he was treating addicted patients in his practice. The evidence is also admitted to explain why the medical and prescribing records for these patients terminate. The evidence also explains why these patients cannot be called as witnesses. The evidence also provides additional examples of toxicology testing. You must not consider this evidence for any other purpose. In particular, the fact that BE and AL are dead may not influence your decision on the "death resulting" enhancement regarding patient DH.

Dkt. No. 44, PgID 210 (footnote omitted). Defendant seeks to exclude evidence of the deaths of AL and BE as not relevant to the charges and as being far more prejudicial than probative.

> Evidence is relevant if:
>
> (a)   it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b)   the fact is of consequence in determining the action.

Fed. R. Evid. 401. Rule 402 makes all relevant evidence admissible (except as otherwise provided by law), and all non-relevant evidence inadmissible. *Huddleston v. United States*, 485 U.S. 681, 687-688 (1988). A reasonable explanation of how the evidence makes a fact of consequence more or less likely resolves the relevance issue. The fact that a party contesting admissibility can supply an alternate explanation of the evidence that disconnects it from the fact of consequence is not significant under Rule 401. *Old Chief v.*

*United States*, 519 U.S. 172, 179, 184 (1997); see *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 921 (3d Cir. 1985) ("evidence need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not."). Resolving conflicting explanations of evidence is for the jury. *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978) (alternate explanations go to weight, not admissibility).

Defendant argues that the deaths of AL and BE are not "directed to a fact in issue in this case. . . [as] the fact that two patients are dead is not all connected to the charges in the indictment that prescriptions Defendant provided to those patients were medically unnecessary." The Government argues that evidence of their deaths is necessary to rebut Defendant's presumed argument that the toxicology report regarding the cause of DH's death is unreliable. The Government intends to introduce facts regarding the deaths of BE and AL, together with their toxicology reports from the same laboratory that analyzed Defendant's toxicology report, to demonstrate that the toxicology report regarding the cause of DH's death is reliable. Defendant responds that he is not going to argue that the toxicology report regarding DH's death is inaccurate or that DH died of a heroin overdose – unless new information indicates the presence of heroin metabolites in DH.

The Government next claims that the jury might draw a negative inference against the Government for: (a) its failure to call BE and AL as witnesses at trial; and (b) the absence of medical or prescription records for BE and AL after the respective dates of their (unmentioned) deaths. Defendant asserts that the standard jury instruction that jurors

are to decide the case based upon the evidence admitted – and cautions them not to speculate – will satisfy the Government's concern that jurors will speculate why the deceased patients are not called at trial or why their medical records end suddenly. Defendant also represents that he will not argue that a lack of evidence regarding the absence of those two patients establishes reasonable doubt regarding Defendant's guilt on the causing death charge.

As Defendant argues, there is a presumption that jurors follow their instructions. *See, e.g., Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000) ("we must presume that juries follow their instructions"); *see also Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000); *U.S. v. Tines*, 70 F.3d 891, 898 (6th Cir. 1995), *cert. denied*, 516 U.S. 1180, 116 S.Ct. 1280, 134 L.Ed.2d 225 (1996). Accordingly, Defendant asserts there is no logical reason why jurors would draw a negative inference as to why the deceased patients are not called as witnesses or their medical records come to an end, such that their deaths become relevant. Alternatively, Defendant contends that the jury could be offered a neutral, non-death-related explanation or instruction regarding the nonappearance of some patients (including AL and BE).

The Government asserts that the fact that the patients died of drug overdoses is evidence that Defendant knew or should have known that prescribing controlled substances to BE and AL was outside the standard of care because they were addicts. Defendant contends that the deaths of BE and AL are not, as the Government argues, relevant to show that he ignored warning signs and knew or should have known that he

was prescribing narcotics to addicts.

The Court finds that the evidence of the deaths of BE and AL is relevant, for the reasons stated by the Government, particularly with respect to the charges against Defendant involving BE and AL (Counts Nine - Thirteen).

Defendant next argues that the danger of unfair prejudice associated with evidence of the deaths of BE and AL would greatly outweigh any minimal probative value of such deaths because Defendant is facing the charge of causing the death of DH. The Sixth Circuit has consistently held that the level of unfair prejudice necessary to exclude otherwise relevant evidence is a high bar to meet and must be of the ilk to suggest a decision be made on an improper basis. *U.S. v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2009) ("[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis"). Rule 403 operates to preclude evidence only if it is prejudicial in the sense that the jury cannot rationally evaluate it. *See In re Air Crash Disaster*, 86 F.3d 498, 538 (6th Cir. 1996) ("Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant – the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or inappropriate. The truth may hurt, but Rule 403 does not make it inadmissible on that account.").

Defendant claims that jurors likely would "be shocked by the evidence that two other patients of Defendant died." This argument tracks the holding of the Sixth Circuit in *United States v. Asher*, 910 F.3d 854, 861-62 (6th Cir. 2018), a case that focused on Rule 404(b)

evidence but also considered the effect of "unfair prejudice" and Rule 403. That court stated, in part:

> On the other side of the scale rests unfair prejudice—the "undue tendency to suggest a decision based on improper considerations," like the chance that the jury will convict the defendant because of his prior, instead of his charged, conduct. *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) (citing *Sutkiewicz v. Monroe Cty. Sheriff*, 110 F.3d 352, 360 (6th Cir. 1997)). One form of unfair prejudice involves the risk that the prior act could cause the jury to reach a verdict based on emotions instead of evidence. *Old Chief*, 519 U.S. at 180, 117 S.Ct. 644. This may occur when, for example, the prior-act evidence so shocks the conscience that the jury may decide that the defendant is a bad person and deserves to be convicted, even if his guilt were unproven in the instant case, "because a bad person deserves punishment." *Id.* at 181, 117 S.Ct. 644. Certainly, a jury is more likely to engage in this type of judgment when the prior-conduct evidence portrays the defendant as having committed an appalling act. But when the charged crime has "inflammatory potential" similar to or greater than the prior act, the risk of the jury being inflamed by presentation of the prior-act evidence may be diminished. *United States v. Mandoka*, 869 F.3d 448, 459 (6th Cir. 2017); *see also Stevens*, 303 F.3d at 716–17. If a juror has already heard about the defendant's participation in a terrible charged act, he is less likely to be uncontrollably impassioned when presented with evidence of a similar or less shocking act. Thus, calculating this form of prejudice must involve some comparison between the inflammatory nature of the charged crime to that of the prior act.
>
> Another risk of unfair prejudice, and the one at issue in this case, involves the tendency of the evidence to lure the factfinder into an impermissible propensity line of reasoning — "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." *Old Chief*, 519 U.S. at 180, 117 S.Ct. 644. This risk is heightened when the prior act is much like the charged conduct. As we have said, "[w]hen jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." *United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010) (quoting *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994) ). So the same factors that make prior-act evidence probative — similarity and temporal proximity — may also increase the risk of this form of unfair prejudice.
>
> Finally, when determining whether evidence is unduly prejudicial, we consider whether a limiting instruction can mitigate the risk of prejudice. *See*

*United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007). Limiting instructions should identify "the specific factor named in the rule that is relied upon to justify admission of the other acts evidence, explain why the factor is material, and warn the jurors against using the evidence to draw" improper inferences. *United States v. Bell*, 516 F.3d 432, 441 (6th Cir. 2008) (quoting *Johnson*, 27 F.3d at 1194).

But sometimes evidence is so prejudicial that the risk of a jury's improper use of the evidence cannot be quashed by a judge's instructions. In *Jenkins*, the defendant was tried for drug distribution and gun possession crimes arising out of a search of his residence. 593 F.3d at 480. The principal issue was whether Jenkins (as opposed to someone else) constructively possessed the guns and drugs found in his residence. *Id.* at 483. Over Jenkins's objection, the government offered testimony that eight years prior, he was caught distributing marijuana outside the same residence. *Id.* at 484. The government argued that Jenkins's previous crime tended to show that he knowingly possessed the drugs at the same address with the same intent eight years later. *Id.* at 485. We assumed that Jenkins's prior convictions had some probative value for proving his intent, and we acknowledged that the district court properly instructed the jury about the impermissible use of the evidence. *Id.* at 485–86. Yet we held that the evidence should have been excluded because of its unfair prejudicial effect. *Id.* at 486. We emphasized that the government had other "overwhelming" evidence of intent and the prior act revealed essentially *863 the same crime as the charged conduct. *Id.* Under those facts, we were "firmly convinced that the prejudicial effect of Jenkins's prior conviction substantially outweighed its probative value." *Id.*

Defendant contends that the Government's proposed instruction would make things even worse than if no instruction was given at all because the proposed instruction would underscore or highlight an improper inference/prejudice to the jury, as limiting instructions can do. Citing Joel D. Lieberman & Jamie Ardnt, *Understanding the Limits of Limiting Intructions*, 6 PSYCHOL. PUB. POLICY & LAW 677 (2000) (summarizing some of the social science on this issue).

The Court concludes that the evidence of the deaths of AL and BE is highly and unfairly prejudicial in this case. First, the circumstances of their deaths has no bearing on

-10-

whether Defendant's actions or inactions *vis a vis* DH caused the death of DH. Second, evidence that two of Defendant's other patients died from drug overdoses could be highly inflammatory and create a great risk of unfair prejudice because those other deaths are similar to the death of DH. Such evidence could cause a jury to find that Defendant should be punished, even if the jury did not conclude that Defendant was responsible for the death of DH. Third, a standard instruction about considering only the evidence presented will adequately address the Government's concerns that the jury will hold it against the Government for not calling AL and BE as witnesses or only including a limited medical record for those two patients. The Court grants Defendant's motion and exclude evidence of the deaths of AL and BE.

### C. Evidence of Drug Diversion

The Government intends to introduce, through an expert witness (Dr. Daniel Berland), that most of the controlled substance prescriptions issued by Defendant: (1) were for the strongest tablets available; and (2) had a high street value, rather than a random distribution of various strengths of controlled substances.[1] The Government proposes to have Dr. Berland testify that such a prescription pattern is unusual in a "legitimate medical practice." The Government argues that such testimony is relevant to a core issue in the case, which is whether Defendant prescribed drugs outside of usual professional practice or for no legitimate medical purpose. The Government acknowledges that such testimony is not, in itself, conclusive evidence that Defendant was prescribing outside the usual course of

---

[1]Defendant has not challenged the qualifications of Dr. Berland.

medical practice, but it argues that the evidence is relevant for that purpose.

Defendant argues that there will be no evidence that he was aware that any of his patients sold their prescriptions or controlled substances, so any testimony advocating as much would be purely speculative. Defendant asserts that such evidence should be excluded because it is not relevant to the charges against him, is more prejudicial than any probative value, and is speculative. It is undisputed that there will be no direct testimony that Defendant was aware of any drug diversion by his patients, but the Government has indicated that it intends to introduce evidence that some patients' urine screens tested negative for the controlled substances Defendant prescribed for them. The Government argues that those negative tests could indicate that patients were selling the drugs ("One of the circumstances giving rise to a negative test is when the patients sells the drugs"). The Government contends this allows for a fair inference, not speculation, that Defendant prescribed many of his patients the most valuable drug if they wanted it, even if the patient was not consuming it (properly). Defendant argues there are reasons other than diversion of the drugs that a patient might test negative, such as if the patient took the drugs more quickly than prescribed or did not take them at all because they were not needed.

With respect to the testimony of an expert witness, Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon

scientific facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 charges district court judges with the task of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

The Sixth Circuit has explained the district court's gatekeeping responsibility under *Daubert* as follows:

> In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that scientific evidence proffered by an expert must be "relevant to the task at hand" and must rest "on a reliable foundation." The Supreme Court subsequently affirmed that *Daubert*'s principles apply more generally to all expert testimony admissible under Rule 702 in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The maxims set forth in *Daubert* and *Kumho Tire* have since been incorporated in Rule 702 . . .
>
> * * *
>
> In essence, *Daubert* and its progeny have placed the district courts in the role of "gatekeeper," charging them with evaluating the relevance and reliability of proffered expert testimony with heightened care.

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294-95 (6th Cir. 2007). This "gatekeeping responsibility" includes an obligation to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th Cir. 2001) (quoting *Kumho*, 526 U.S. at 141).

Defendant argues that the expert's speculation regarding what Defendant knew or should have known regarding possible drug diversion by his patients is inadmissible under

Rule 704(b) because an expert is barred from opining regarding a defendant's intent:

> Rule 704. Opinion on an Ultimate Issue
>
> (a) In General--Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.
>
> (b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

For those reasons, Defendant requests that the Government's proposed expert not be permitted to testify that Defendant prescribed drugs which had a high street value and opine that Defendant issued prescriptions knowing they would be sold illegally.

Defendant also contends that the proposed expert testimony would violate the Confrontation Clause to the extent the expert relies on the statements of witnesses who will not be testifying because Defendant will not have an opportunity to cross-examine the sources of the expert's information utilized to reach his or her conclusions. Citing *Crawford v. Washington*, 541 U.S. 36, 54, 68 (2004).

The Court denies Defendant's motion to exclude evidence of drug diversion. The testimony of Dr. Berland and the Government's argument do not state an opinion about the state of mind of Defendant. As the Government argues, the testimony is relevant to the issue of whether Defendant prescribed drugs outside of the usual practice of medicine but it is not speculative or conclusive. There might be legitimate reasons why a physician would prescribe controlled substances in the manner Defendant did, and it will be for the jury to determine the intent and knowledge of Defendant, not Dr. Berland.

## IV. Conclusion

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion in Limine to Exclude Evidence of Patient Deaths [Dkt. No. 40] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion in Limine to Exclude Evidence of Drug Diversion [Dkt. No. 42] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Amend First Superseding Indictment [Dkt. No. 41] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff shall file its First Superseding Indictment within seven (7) business days of this Order.

IT IS ORDERED.

Dated: February 22, 2019          s/Denise Page Hood
                                  Chief Judge, U. S. District Court