UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                      CASE NO. 17-20701
                                      HON. DENISE PAGE HOOD
v.

DR. BERNARD SHELTON,

      Defendant.
_____/

**ORDER DENYING DEFENDANT'S
MOTION TO EXCLUDE EXPERT TESTIMONY
AND FOR *DAUBERT* HEARING [Dkt. No. 28]**

**I.    Introduction**

Defendant has been charged in a 21-count Indictment with unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1). Count Seven charges that Defendant's prescription of oxycodone for a patient (Dennis Hooey or DH) resulted in DH's death. Conviction on Count Seven carries a mandatory minimum sentence of 20 years to life.

On October 28, 2018, Defendant filed a Motion to Exclude Expert Testimony and for a *Daubert* hearing. [Dkt. No. 28] The Government filed a response, and Defendant has not filed a reply. For the reasons that follow, Defendant's Motion is denied, both as to excluding the Government's expert and for holding a *Daubert*

hearing.

## II. Background

DH was a patient of Defendant for approximately the four-year period preceding his death. Defendant had prescribed DH Xanax, Valium, hydrocodone and oxycodone at various times. DH was a heroin user, drug addict, an alcoholic, and a chain smoker; he abused prescription drugs; and he had been hospitalized on numerous occasions for alcohol intoxication and withdrawal. Defendant would give DH urine tests to determine if DH was taking medications appropriately. DH would frequently test negative for drugs that Defendant had prescribed, which (according to the Government) "indicates that a patient may be taking more of a drug than prescribed, using all of the medication before the next visit to the doctor." Dkt. No. 3, PgID 90-91. DH admitted to Defendant (as set forth in DH's patient chart) taking too much medication. DH also would test positive for drugs not prescribed., which (according to the Government) "indicates that a patient is getting narcotics from other illegitimate sources." *Id*. at PgID 91.

DH last saw Defendant on January 14, 2016, when DH complained of a back injury that required DH to stay on a couch. By that time, DH had been taking oxycodone (prescription of 10mg, two tablets every eight hours) for an extended period of time for back pain. At the January 14, 2016 visit, Defendant prescribed DH

oxycodone (15 mg, two tablets every eight hours) and Xanax. Those prescriptions were filled on January 18, 2016. On January 20, 2016, DH was hospitalized for shortness of breath/shallow breathing, which the Government states is "a sign of possible opioid overdose/abuse," *id*., and received several doses of naloxone during that hospitalization.

On January 23, 2016, DH took medications, fell asleep on the couch, was heard snoring about 3:00 a.m. on January 24, 2016, but was found unresponsive by his fiancée/girlfriend later that day, when he was pronounced dead. At the time of DH's death, there were 49 less oxycodone pills and six less Xanax pills than should have been left from the medications filled on January 18, 2016 (if the medications were taken as directed).

An autopsy was conducted by the Deputy Macomb County Medical Examiner on January 25, 2016. The Deputy Macomb County Medical Examiner concluded that DH died as the result of "[i]ntoxication by the combined effects of multiple prescription medications." Dkt. No. 34, Ex. B at 20. The toxicology report indicated that the levels of prescription medications in his blood (for Valium, Xanax, and oxycodone) were at very low levels and that there was a presence of opiates (at an unreported level) and benzodiazepine (Xanax), which (according to Defendant) "suggests [DH] apparently had used a substance like heroin or fentanyl." Dkt. No. 28,

PgID 68. The autopsy report stated that there was bruising on the inside of each elbow.

## III. Analysis

The Government proposes calling Dr. Stacey Hail, an emergency room physician, to testify that DH would not have died but for the oxycodone prescribed by Defendant.

### A. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon scientific facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 charges district court judges with the task of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The gatekeeping role "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is ... valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This role applies to all

expert testimony, not only to "scientific" expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). As the advisory committee notes to Rule 702 explain, expert testimony is admissible provided that "the principles and methods [used by the expert] are reliable and applied reliably to the facts of the case." FRE 702 – Advisory Committee notes (2000 amendments).

The Sixth Circuit has explained the district court's gatekeeping responsibility under *Daubert* as follows:

> In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that scientific evidence proffered by an expert must be "relevant to the task at hand" and must rest "on a reliable foundation." The Supreme Court subsequently affirmed that *Daubert*'s principles apply more generally to all expert testimony admissible under Rule 702 in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The maxims set forth in *Daubert* and *Kumho Tire* have since been incorporated in Rule 702 . . .
>
> * * *
>
> In essence, *Daubert* and its progeny have placed the district courts in the role of "gatekeeper," charging them with evaluating the relevance and reliability of proffered expert testimony with heightened care.

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294-95 (6th Cir. 2007). This "gatekeeping responsibility" includes an obligation to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th

Cir. 2001) (quoting *Kumho*, 526 U.S. at 141).

The "gatekeeping" role does not always necessitate a pretrial hearing. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999). On the contrary, the Sixth Circuit has repeatedly emphasized that a district court "is not required to hold an actual hearing to comply with *Daubert*," and that the decision about whether to hold such a hearing falls firmly within the district court's discretion. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001) (citing *Greenwell*, 184 F.3d at 498 and *Kumho*, 526 U.S. at 152). Where a district court opts not to hold a *Daubert* hearing, the court may satisfy its gatekeeping role by "keep[ing] watch over the proceedings, and, with the aid of objections from [counsel], eliminat[ing] methodologically unsound or irrelevant expert testimony." *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 F. App'x 479, 484 (6th Cir. 2002).

Whether deciding the issue on the parties' written submissions or after holding an evidentiary hearing, a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The trial judge must determine at the outset. . .whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. "One key consideration is 'whether the reasoning

or methodology underlying the testimony is scientifically valid.' The inquiry is 'a flexible one,' and 'the focus. . .must be solely on principles and methodology, not on the conclusions they generate.'" *Newell Rubbermaid, Inc. v. Raymond Corp*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert* at 592-93, and 594-95).

In *Daubert*, the Supreme Court set out four factors the court may consider when assessing the reliability of an expert's methodology, including: (1) whether the theory is based on scientific or other specialized knowledge that has been or can be tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error and the existence of standards controlling the theory's operation; and (4) the extent to which the theory is generally accepted in the relevant community. *Id.* at 593-94. Although *Daubert* identified a number of potential considerations for determining reliability, the district court has "wide latitude" in "deciding how to test an expert's reliability," and must be afforded "considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.,* 526 U.S. at 137. The district court need not follow one particular method for deciding how to test an expert's reliability, nor does this decision even have to take place at a preliminary hearing. *Id.; see also Greenwell*, 184 F.3d at 498 ("[T]he trial court is not required to hold an actual hearing to comply with *Daubert*…").

"Once initial expert qualifications and usefulness to the jury are established,

however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, *Kumho Tire*, and related precedents." *Id*. at 715.

To sustain a charge under 21 U.S.C. § 841(a)(1) that includes a death and results in an enhancement under § 841(b)(1)(C), the Government must prove: (1) knowing or intentional distribution of an illicit drug, and (2) that the death resulted from the use of that drug. *Burrage v. United States*, ___ U.S. ___, 134 S.Ct. 881, 887 (2014). Where use of the drug prescribed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C), unless such use is a but-for cause of the death or injury. *Burrage*, 134 S.Ct. at 892. But-for causation occurs when the distributed drug combines with other factors to produce death, and death would not have occurred without the incremental effect of the controlled substance. *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015).

*Burrage* rejected a more relaxed standard, which allowed conviction when the drug distributed merely "contributed" to the death. As the Supreme Court stated, *Burrage* established a more stringent proximate cause requirement:

> When a crime requires "not merely conduct but also a specified result of conduct," a defendant generally may not be convicted unless his conduct

is "both (1) the actual cause, and (2) the 'legal' cause (often called the 'proximate cause') of the result." 1 W. LaFave, Substantive Criminal Law § 6.4(a), pp. 464-466 (2d ed. 2003).

* * *

"Results from" imposes, in other words, a requirement of actual causality. "In the usual course," this requires proof "'that the harm would not have occurred' in the absence of--that is, but for--the defendant's conduct." *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. ----, ----, 133 S.Ct. 2517, 2525, 186 L.Ed.2d 503 (2013) (quoting Restatement of Torts § 431, Comment a (1934)).

*Burrage*, 134 S.Ct. at 887-88.

**B.   Analysis**

"The party seeking to have the testimony [of an expert] admitted bears the burden of showing that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Vaughn v. Konecranes, Inc.*, 642 F. App'x 568, 577 (6th Cir. 2016) (internal citations omitted).

Defendant does not expressly challenge Dr. Hail's qualifications as an expert; Defendant appears to be focusing instead on the methodology and content of her expert report as a basis to exclude her testimony. The Court finds that Dr. Hail has the appropriate training and background to opine on opioid use and overdose deaths -- the issue about which the Government asserts Dr. Hail will testify at trial. The record reflects that Dr. Hail is an emergency room physician, a toxicologist and a

professor of emergency medicine and toxicology at University of Texas Southwestern. Dkt. No. 34, Ex. C at 1. She is a published expert on opioid-related deaths, *id.* at 17 (publication entitled, "Recommendations for the Investigation, Diagnosis, and Certification of Deaths Related to Opioid Drugs"), and speaks frequently on opioids and medical issues in opioid prosecutions. *Id.* at 13 (speech entitled, "Opioid Epidemic: Medical Issues in Prosecutions"). Dr. Hail also has testified seven times as an expert in federal court regarding toxicology and opioid overdoses.

Defendant challenges the "differential diagnosis" methodology employed by Dr. Hail with respect to her opinion that DH's death was the result of Defendant prescribing oxycodone (15 mg) on January 14, 2016. Defendant asserts that Dr. Hail's conclusion was not based on established, peer-reviewed, scientific methodology. Dr. Hail states that she used "differential diagnosis" to determine that the cause of DH's death was oxycodone intoxification "within reasonable medical certainty and/or probability." The Government asserts that "differential diagnosis" is the "gold standard in patient diagnosis and is used every day by all physicians to diagnose their patients' medical problems and is not just for opioid overdose cases." Citing https://www.cdc.gov/urdo/differential.html (Centers for Disease Control, explaining that "differential diagnosis" is "[o]ne of the most important initial steps" when evaluating unknown respiratory illnesses); Fulop M., *Teaching Differential*

*Diagnosis to Beginning Clinical Students*, Am. J. Med., 1985 Dec. 79(6): 745-9. The Government claims that "differential diagnosis" is "peer reviewed" and "generally accepted in the [medical] community," so it is based upon reliable principles and methods. Citing *Daubert*, 509 U.S. at 593-94.

In preparation for her opinion in this matter, Dr. Hail represents that she reviewed:

a. DH's MAPS report (*i.e.,* report showing all controlled drug prescriptions filled by DH);

b. DH's medical file from Dr. Shelton's office;

c. January 24, 2016 police report regarding DH's overdose death;

d. Photos taken by police at the scene of the overdose;

e. Medical Examiner's Report (*i.e.,* autopsy report);

f. Toxicology report; and

g. Medical records from St. John Macomb-Oakland Hospital regarding multiple admissions of DH.

Dkt. No. 34, Ex. A at 3-4. Dr. Hail stated that she is aware of the "but-for" standard in drug related deaths and ruled out the following possible causes of death: choking; chronic obstructive pulmonary disorder exacerbation; brain hemorrhage/stroke; heart attack; caffeine overdose; Valium overdose; and Xanax overdose.

The Government argues that the evidence above, together with several other

factors were "integral in forming the basis of her medical opinion" that an oxycodone overdose due to Defendant's distribution of oxycodone on January 14, 2016 was the most likely cause of DH's death. Dkt. No. 34, PgID 96. The other relevant factors included: (1) Defendant prescribing oxycodone and Xanax to DH shortly before his death; (2) the inconsistent toxicology results of DH on January 19, 2016; (3) DH going to the emergency room on January 20, 2016 for an overdose; and (4) the fact that DH was heard snoring on the couch around 3:00 a.m. on January 24, 2016 before being found dead there that day. The Government contends that those things are "all hallmark indicators of a drug addict who died of an opioid overdose." *Id.*

Defendant argues that Dr. Hail did not address the possibility that the missing pills may have been diverted rather than consumed, such as being traded for heroin or given to others, even though Dr. Hail opined that there were no defined lethal levels of drugs and the blood levels for his prescribed drugs were all very low. Defendant also notes that DH's urine tested positive for opiates. Defendant argues that, although the report sounds "scientific," the science of her opinion is "actually too soft to be admissible," as it is speculative and remarkable for the things it did not address (the positive test for opiates and the low drug levels in the blood).

The Government counters that Dr. Hail considered heroin overdose, as DH's blood was tested and there was no heroin metabolite in his blood. The Government

also argues that Defendant's argument about what Dr. Hail did not consider does not disqualify her, as Dr. Hail applied her specialized knowledge and training to consider the facts when utilizing the "differential diagnosis" method.

### C. Conclusion

The Court will allow Dr. Hail to testify as an expert at trial regarding her use of "differential diagnosis" to opine that DH's death was most likely caused by oxycodone overdose. Dr. Hail relies on an established and recognized scientific methodology, and it can be applied to the facts at issue in this case. Dr. Hail has testified as an expert regarding the same issues that the Government proposes to call her to address at Defendant's trial. The Court notes that Defendant has not analyzed in any detail the facts and circumstances surrounding DH's death, nor identified any specific reasons why Dr. Hail or her testimony should be excluded. For those reasons, the Court finds that the Government has met its burden to have Dr. Hail testify as an expert in this case. To the extent that Defendant has raised any challenges in his motion, such challenges can appropriately be raised on cross-examination of Dr. Hail. For all of these reasons, the Court concludes that a *Daubert* hearing is not necessary in this case.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Exclude Expert

Testimony and for *Daubert* Hearing [Dkt. No. 28] is DENIED.

IT IS ORDERED.

                                                s/Denise Page Hood  
                                                DENISE PAGE HOOD  
Dated: March 15, 2019              UNITED STATES DISTRICT JUDGE